So, Mr. Pickus, are you going to begin? Thank you, Your Honor. My name is David Pickus. I represent UBS, the appellant. May it please the court. I'm going to presume that the court has great familiarity with the briefs and the records, so I'm not going to redo the record. You can presume that, but I'll tell you this. You can also presume that we do not have a firm grasp on the eve of oral argument filing by the appellees about mootness, which frankly, I'm flabbergasted that it was filed this late, but we can talk about that and you certainly have an opportunity to file a written response to that. Thank you, Your Honor. I'll proceed then with addressing the merits. It doesn't mean, though, that we won't ask some questions about it. It seemed to me there might be a real mootness issue here, but one question I have is how it pertains to the wife. As I understand it, there are claims against the wife, but this was Esteva's bankruptcy. Am I right about that? That's right, and this is central, Your Honor, to this appeal, whether the wife is in some way responsible or whether she's entitled, I should say, to be able to retain the fruits of her husband's illegal conduct. I think you're right on point there. I don't want to start citing authority because I got this even later than the court did, but as I recall, there is authority. I got it this morning. So did I. I didn't see it this morning. So did I. But there is authority for the court's jurisdiction, and we'll present it at an appropriate time, but I thank you. I think that addresses some of the constitutional mootness issues. I suspect if you go claim by claim where there's a confirmed bankruptcy with complete payouts, some of the claims might be moot, although the fraudulent conveyance stuff might not be for the reasons that the Chief Judge said, but I haven't thought it through yet, and I'm interested to see your response. But what would it make of equitable mootness, which deals not necessarily with the ability to grant relief, but deals more with the confirmation of the plan and having to unwind that and the equities regarding that? Your Honor, again, I am hesitant to cite any authority. I'm not asking. I don't want to put you on the spot with authority. You're a bankruptcy practitioner. You understand the law. I'm asking for your thoughts. Yes. As I recall, and again, I'm just going from recollection, I would have needed a truck to bring the entire file down with me, but as I recall, there was an exception in either the disclosure statement or the plan itself that was confirmed for this adversary proceeding. In other words, you think it was their statement that there was no affirmative objection is sort of besides the point because there was a carve out or waiver. Exactly. My recollection is, and again, I apologize if my memory is wrong, but my recollection is that there was some kind of a carve out in there and there's also case law, and again, I haven't had a chance to check it and see if it's good law in the 11th Circuit, but there is case law that says that an adversary proceeding that is central to the confirmed plan is not barred by race judicata by the confirmed plan. Well, that's a little different than equitableness, but okay. Sure. I look forward to reading your response. Okay. Thank you, Your Honor. I'm sorry. I'm not prepared to address it. What I'd like to do, Your Honor, if I may, is to focus on two or three points that are made in the record by the plaintiffs themselves that I believe support our position on some very key issues here. One of them, of course, and this is a summary judgment case. I need to keep stressing that. We didn't cross move. This is a summary judgment case. As the court knows, one of the big issues here is whether the CRA, the agreement itself, makes the wife liable. So let me ask you about that, because it seems to be most of the claims, those outside of fraudulent conveyance, rise and fall on how we read the CRA. It would seem to me. That's true. Which really isn't a factual issue. It matters for summary judgment, but it is more of a legal issue in how we read the contract. So, as I understand, the key issue is whether you, as used in the contract, means the both of them or an individual. Two issues, Your Honor, and that's one of them. Second big issue is... Let's do that one first. Okay?  All right. Because that seems to be the big one to me. Now, the first place you have to start is the definition, I would think, right? Correct. All right. And the definition says that you is defined as you, quote, refers to you as a client of UBS, right? Correct. What do we make of the indefinite article A? A client. I don't think that that's significant, Your Honor, because the security interest is being granted by the wife as a client. Well, I agree with you that the security interest... We'll get to the security interest in a second. But in terms of... And it may be that it doesn't affect this. But do you agree that by saying... By you referring to you as a client, we're referring to a person in the singular and not in the plural? Yes and no, Your Honor. I think A is obviously a singular term. It seems obvious to me. But we can't take this clause in isolation. I agree with that. And then you have to look at the joint and several liability clause. Well, no, we don't. So if we can agree that at least that A would seem to indicate singular there, I agree with you we need to look at the whole. So let's look at further down. We have the representation section. And the representation section says this. I'll use... I'm going to cut out some stuff. So I'm not quoting directly. But it says, by signing a client representation agreement, you make the following representation. And then there's some language. And then it says, you have notified us if you, your spouse, or any beneficial owner of the accounts, account or counts, are or become employed by any of the following, including the bank itself or some other folks. Doesn't that indicate that you is different from your spouse? No, Your Honor. Not necessarily. And the reason I say...  How does that not necessarily draw from that sentence? Because, Your Honor, the purpose of that section is to comply with a FINRA and UBS rule that there be a disclosure if a party... I agree. But the same term... The same defined term is used. I mean, I... You're right what the purpose may be. And it's different from the security interest part. But if the same terminology is used, why would we treat that term, that defined term, any differently when that same term is used later on in the same exact contract? Well, the reason is, Your Honor, that even though you is, in our view, in the singular or the plural, it's a second person pronoun, either way, if there is a specific section in the agreement that carves out you for one person, let's say it refers to you as a financial advisor of UBS, which Mr. Esteva was, then obviously we're referring to him. The reason I would respectfully disagree with you, Your Honor, is because in the context of the security agreement, that very clearly relates to both parties. If not on its face, then because of the joint and several liability clause. I know, but if the contract uses you, it defines it in a singular term. It itself, naturally, is singular. I mean, we don't refer to you generally as, maybe when we do, we say y'all, but when we just say you, we generally aren't referring to the group. And then you have the representation section, which seems to indicate that you is different from your spouse. I'll read another part from the representation section, quote, you are representing, quote, that no one other than you and the individual identified to UBS in connection with opening the account has or will have an interest in the account. In other words, it specifically references another person other than the individual when opening the account, which is, in other words, a second signer. That seems to cover exactly the situation. Well, again, Your Honor, that would be an example that I raised of a specific carve out. But otherwise... I have a question, President, which is, one thing that I didn't see covered a lot in the briefing, frankly, from either side, was really the relationship between the promissory agreement and this client agreement. And why... Tell me about how those two work together to get you where you want to go here. Well, we don't necessarily have to rely on the promissory note for the wife. And that's where I think the bankruptcy court made one of its biggest errors. Bankruptcy court said, well, she didn't sign the promissory note, so therefore she can't give UBS a security interest in the account. And of course, we've explained very thoroughly in our brief that this refers to any agreement that either of the parties made. We go back to Judge Luck's question, of course, but it refers to any agreement that either party made here with UBS. So we don't have to find that she signed the promissory note agreement. It's sufficient to say, and there's no dispute, that Mr. Estava signed it. And then if you look, and maybe this goes more to the fraudulent transfer argument, he inadvertently admits in his opposition papers that without these transition payments, he wouldn't be able to repay this loan. So at a big picture level, I think I understand that you're saying either he signed this promissory note, and when she signed this client agreement, as he did, took on essentially responsibility for that. But if that's not true, then he must have either constructively or intentionally created a fraudulent transfer to his wife to avoid the obligations of the promissory note. Is that what your argument is? Is it an either or? Well, I think that is an important part of our argument. And I would refer the court, if I may, to the transition payments agreement, which went along with the promissory notes. And there is a particular section in this agreement, and I call your attention to document 22-4 in the record, where the transition award agreement says, further, employee's right to receive the transition payments is also subject to employee not doing on or before the payment dates any of the following. And then it includes a bulleted list. And two of the items in those five bullets are employee materially breaches or contributes substantially to a material breach of applicable legal and or regulatory requirements. There's no dispute here that the husband robbed Peter to pay Paul. And then the next bullet says employee engages in conduct which results in or contributes substantially to a material breach of UBS's policies, and so on and so forth. So this not only goes to your question, Judge Grant, but it also goes to his intent and knowledge when he transferred funds.  I have a question about the actual intent, whether you conceded it. I understand this argument about the creation of the account and what the district bankruptcy court said about that. But it's not clear to me from the record, though, that the bankruptcy court understood that it needed . . . that that remained an issue, that the actual fraud did. And it's important because it seems to me that there are really four badges of fraud here. But I'm not sure that you've really . . . that you really preserved that and brought that to the bankruptcy court's attention, that it had to rule on it. Oh, I think so, Your Honor. And if you look at the complaint, the original counterclaim, I should say, refers to the deposit in the account . . . There's no doubt the claim does. But what happened was she has a summary . . . the bankruptcy court has a summary judgment hearing. The bankruptcy court exhaustively goes through all of the claims. And when it gets to the actual fraud part of the fraudulent transfer count, she says this was conceded at the hearing, of which we don't have a transcript of, because we don't know, so I got to take her word for it. And then at the end, she says, anything I said wrong here, any corrections? And no one says a word. There's not a rehearing filed regarding that. And only now are we told, well, she didn't really mean it. She meant it for this part, but she didn't really mean it for that part. Well, Your Honor, I did concede. I'll be candid with you. About the creation of the account. About the creation of the account, okay? That in and of itself wouldn't show intent. Maybe he did intend. Maybe he didn't. But, you know, I didn't argue that point. We don't know what you conceded. I know . . . I haven't . . . as an officer of the court . . . I'm admitting it to you. I know. Well, you're admitting to me . . . What you're admitting to me is . . . What you're saying is doesn't matter. So it's not much of an admission. But what she says that you conceded that count. And I understand . . . We don't have a transcript of what you actually conceded. You're just telling me . . . And you don't . . . You don't say, well, we didn't concede the count, Your Honor. Well, but, Your Honor, if I may, I was trying to answer the judge's question directly, just as I try to answer every judge's question directly. And she asked me whether the creation of the account constituted the fraudulent transfer. And I said, no. I really didn't think there was any need to go further because if you look at the record, our papers . . . We don't have a transcript of that. And that's the problem. That's part of the problem for that . . . for me, for that part. But I know we're way past time, Chief. Yeah. Let's hear from the other side. Okay. You've saved three minutes, Mr. Bectus. Thank you very much. Mr. Fudman. Good morning, Your Honors. I'm Gary Murphrey. I'm going out of turn because I was the drafter of that late night motion. And I do apologize. But this isn't the first time I've been in front of this court. And at the last hearing, we came in here and the panel gave us a very severe lesson about how serious the Eleventh Circuit takes its jurisdictional inquiry. And I literally noticed it last night. I remember that oral argument. But we also take seriously being prepared for a hearing and getting a motion. I got it when I got in this morning at about 7.15, 7.30 or so. And I've read it. I've looked at all the issues to the extent that I can in the time that I had it. But that puts your opposing counsel, that puts us there. And I'll just add this. The plan was confirmed in 2022. I understand the payouts didn't happen until a little bit later. But if . . . Well, even if it's just everything got completed in December of last year, it's two months ago. Correct. But I was taking some language out of this court's case law, which says this court takes it very seriously. It has an independent . . . Did you sign that case law last night? I guess the problem is that we're not understanding . . . we're not questioning that a briefing related to this was filed. We're questioning why it wasn't filed months ago. Well, the reason it wasn't filed months ago . . . I didn't conjure up the legal argument until last night when I was, again, rereading through the materials, getting ready for this oral argument. And you know how things do click occasionally. It just clicked. It's not particularly a simple concept, what I uncovered. But once I thought it out, I thought I had a duty to advise the court. And I wasn't . . . I mean, I could have called it a notice of a question of jurisdiction because I'm not sure . . . I wasn't advocating that I'm absolutely right. But I do think there's an issue there, and this court takes that issue seriously. So I thought it was my duty to bring it to the court's attention, even at that late hour. But . . . Well, I will give you this. I mean, at least constitutional mootness can be raised sua sponte, can be raised by us at any time. It is important. I'll grant you that. I certainly didn't have any . . . I wasn't trying to ambush a counselor or anything. So getting past that, so there's two questions, I think, on that that are worth . . . that we talked about with your opposing counsel that I'd like your view on. One was one the chief judge asked, which is, at least with regard to some of the claims, the money is not in the bankruptcy estate. The money stayed in the joint account under the control of the marriage. And so the confirmation doesn't take care of that. And it would seem to me, under estate fraudulent transfer theory, that that money can still be clawed back and that the wife, who isn't subject to the bankruptcy, still has an interest in that money, again, through her marriage as a tenant in the entirety. And so how, at least with regard to the fraudulent conveyance claim, is that moot? Because the plan's been confirmed.  Well, I would take the first part of your question, which was, you know, if the funds didn't affect the lien, well, the fact is, the money can be in the account. But the plan and the confirmation order make clear that UBS's claim of $2 million . . . Is unsecured. But the fraudulent transfer has nothing to do with that. Okay, but I just want . . . the first step is that. Okay, so the fraudulent transfer. How is that moot? That was the question I asked. How would the fraudulent transfer become moot? The fraudulent transfer would, in the sense that, if they were going to use the fraudulent . . . I get . . . okay, the short answer is, the fraudulent transfer issue probably would not be moot. All right, so, and then the second question was on the equitable mootness. And your opposing counsel said his belief was, and I'm not putting him down because he was up on the spot, that there was, he called it a carve-out or a footnote or something in the plan, which acknowledged the adversary proceeding. Is there something to that effect? And if there is, does that not affect equitable mootness? There is a lot of disclosure in both the plan and the disclosure statement. And I even put a footnote in my motion, which cites to the retention of jurisdiction of the bankruptcy court, saying that she was . . . the judge was going to retain jurisdiction to change the plan should this court reverse. That seems to allow the court to . . . that doesn't sound like things are complete then and done. It sounds like there's a possibility of something being undone. To the untrained eye, Your Honor, but what was really going on . . . Well, consider me untrained. Is, let's just, I think we've got to step back to how would the bankruptcy court, even if the judge wanted to follow, even if Judge Isikoff wanted to follow, say, this court, this panel reverses, and the court wants to follow this court's ruling with respect to the confirmation order. Let's think about under what federal rule of procedure can the bankruptcy court reopen the confirmation order? That order was final two and a half years ago or thereabouts. It wasn't appealed from. Under Rule 60, which is the only rule I know of for getting at and modifying a judgment, has various grounds for revisiting and vacating or modifying a judgment. None of those grounds are present here. So even if . . . But if the finality is contingent on what happens here and what happens here does not go to your way, then there's a contingency that's then triggered. I don't understand now what are we talking about? Well, the way to understand it is you have, and this is unique to bankruptcy, you have two separate standalone orders. The one order is what we're talking about in this appeal. That is the final judgment from the adversary proceeding where Judge Isikoff ruled in my client's favor. There was no link. Counsel, I understand the difference between the judgment and adversary proceeding and a confirmation of an underlying bankruptcy. I get it. And the confirmation order confirmed the plan, and in the plan, it's clear that it mentions the issue of the appeal is disclosed, but it classifies UBS's $2 billion claim as unsecured and it treats that claim to the same 10% distribution that Mr. Esteva is going to pay the other Class III unsecured creditors. That was the treatment. The court confirmed the plan. And Mr. Pincus actually was at the confirmation hearing. He asked questions or cross-examined my client, Mr. Esteva. The judge heard the cross-examination, heard the evidence, entered the confirmation order confirming the plan. They knew the order had been entered. They knew they had their appeal going. And it seems as if they could have appealed from the confirmation order that would have preserved this appeal as well as the appeal from the confirmation order. They chose not to. Counsel, I think I understand, and I'm going to wait the response and a reply before I make any final calls on that. Thank you, counsel. All right. Okay. Let's hear from Mr. Fudman. Thank you. Good morning. Good morning. I represent Denise Otero Villarino. By the way, Your Honors, Mr. Esteva and Ms. Otero are in the gallery. I'm going to be talking a little bit about the CRA and to Judge Luck's questions earlier about the definition of you, I'd like to point the panel to the joint . . . By the way, you don't think this case is moot, do you? I'm not a bankruptcy attorney, Your Honors, so I'm not going to address that point. Did you join the motion? I did not. That was filed by Mr. Murphree. Okay. I'm just . . . We got it this morning. No, I understand, but I can't opine on bankruptcy. It's not my area, Your Honor. With respect to the CRA, though, Your Honor, and to Judge Luck's point about the singular definition of you, and I think the contract is very clear. I don't think we necessarily need to get to this issue of mootness because I think the court can rule in our favor and affirm Judge Isikoff's summary judgment. Let me explain why . . . If we don't have jurisdiction, then we can't opine on it. I understand that, Your Honor. I understand that, Your Honor. You'll get your briefing from the other side and you'll make a determination about that. I simply don't want to opine on that issue. If you have an opinion about it, you, too, can file something. Okay. Thank you, Your Honor. I will need some time to do that. All right. With respect to the definition, again, I think it's important to know that UBS is a very sophisticated entity. They've drafted this agreement for tens of thousands, maybe hundreds of thousands of clients. It was never contemplated by UBS that this would be used for these advanced income agreements with its brokers. I think the definition of you is very clear what it means, but also in this agreement under the joint account section, which is on page 34 of 118 of the appendix, they actually carve out another word when they're talking about really all the account holders. They say here, for joint accounts, each person or entity named on the accounts has full power and authority over the account, and the account holders are jointly and separately liable for all obligations with respect to the account. The promissory note was only signed by Mr. Esteva. It was never signed by Ms. Sotero. That is not an obligation of the account. What this is talking about is things like margin. If the couple were to take out margin, that would be a joint obligation of the account. They could have said here, if the word you meant all of the account holders, they could have used the word, they could have substituted the word account holders for the word you, but they specifically didn't. If that's the case, then how do you get around fraudulent conveyance? Because if your client's husband was aware that he had this obligation under the promissory note, and then he moved it into an account that would be protected for that obligation, why isn't that one of several badges of fraud that we would look at and conclude that he intended to put this money out of UBS's reach when he wasn't supposed to? Well, first of all, Your Honor, he was required to put the money in this account, and that's in the record, number one. Number two, he could have moved the money out at any time from this account. He could have spent the money. There was no restrictive covenants in this account. By the way, UBS could have created restrictions on this account, just like a bank might do if you had a construction loan. They might say, hey, you can only draw money as we approve, but they didn't do that. That doesn't answer, let me put it this way, that's a very good answer at trial for why to explain away, but Judge Grant's point to you is, if we look at the actual fraud, and we look at all the badges of fraud, one of them is what Judge Grant just said, and Chief Judge Pryor asked your opposing counsel, there are at least four that I think are triggered under the statute here, and where you have four of them, how does that not create at least a summary judgment issue about that, that would then warrant a trial for you to then explain exactly what you just did, which sounds like a perfectly reasonable explanation. Well, I think that the court considered these things. I think that UBS did not raise these issues appropriately and waive the issues. Tell me how. I think that, to me, is where this rises and falls. And so, I will defer, I will leave one minute of my time for Mr. Murphy to address the fraudulent transfers because that was the argument that he was going to address in this argument. Until he filed something at the last minute. Exactly. I apologize for that, Your Honor. It is quite clear, though, that this agreement, that this agreement, okay, does not create a security interest in Ms. Otero. If you look at the security interest provision on page 37 of 119, here again, it differentiates between you, and it does not use the word account holders, whereas in the other provision, the joint and several, it does. And it says here, as security for the payment of all liabilities or indebtedness presently outstanding or to be incurred under this or any other agreement between you and any UBS entity. So, Ms. Otero did not have a promissory note with UBS. So, there, again, this agreement is quite clear that there is no security interest created with respect to the promissory note in Ms. Otero, which is exactly what Judge Isikoff found. Do you have any other questions about the actual CRA, Your Honor? Okay, I'm going to leave time for Mr. Murphy, then on that question. Okay, Mr. Murphy, you're coming back. Look, here's my concern. His deposits into the house account were to an insider. He clearly retained possession or control of the property after the transfer. It's a joint account. The transfer occurred shortly before, shortly after substantial debt was incurred. The wife provided no consideration. There's four badges of fraud. Two or three is enough to create a genuine issue of material fact. It seems to me like you've got to really, really convince us that this was basically waived. I think I can, Your Honor. I think you can't look at badges of fraud and say, oh, there is that badge, therefore fraud. There are, it's sort of evidence from which you can draw an inference. It doesn't mean if those facts are there, you have to infer fraud. It can create a genuine issue of material fact. There are some unique facts here that the court needs to be aware of. What do we have? What are the unique facts? It is UBS's policy that required Esteva to open a trading account. Was it required that his wife was also on that account? Was it? Yeah. Well, his, their funds, okay, let's step back. Their funds, their marital retirement funds, when he moved over from Merrill Lynch, they took their $500,000 from their Merrill Lynch trading account and they plopped it in the UBS account that Esteva was directed to open. The Merrill Lynch account was joint, so naturally when they opened the UBS account, they opened a joint account. They could have opened a joint account and put the Merrill Lynch money in, and I am assuming from what you're saying that he could have also opened an individual account and put the $2 million in. He could have, but, okay, the number one badge of fraud, I mean, let's step back. The number one badge of fraud is subterfuge. You are trying to hide the money out of the reach of the bank. Here it was the bank that told him, when they issued him the commission's checks, they told him go down the hall to the teller and deposit the check into the UBS account. Okay, Mr. Murphy. But they had... You're over.  I think we understand your position. Mr. Pickus, you've saved three minutes. Thank you, Your Honor, and I'm just going to make two quick points here. I'll tell you the point I want you to make to me. Yes, sir. I want your best arguments from the record that the bankruptcy court was clearly apprised that it still had to rule on the actual fraud issue and that it wasn't waived. I understand the point about the concession only pertaining to the creation of the account. I understand that argument and what the record says about that. What I'm less certain about is whether the bankruptcy court really understood that the legal issue itself was at play. When I look at this record, it seems like the bankruptcy court thought that's no longer an issue. Well, Your Honor, if I may, that's why Your Honor has a job on the Court of Appeals because if the lower court, district court bankruptcy judge, makes an error, which I respectfully submit with all respect to the bankruptcy judge . . . I don't know if you listened to the last argument, but one of the things that I have to do in the Court of Appeals is respect that the other courts, the courts whose work we're reviewing, were trying to make sure they understood what was truly at issue between the parties. Those courts have to squeeze down disputes and whittle away things that aren't really at dispute to figure out what has to be decided or not. That's my concern. Well, at best, Your Honor, that would have forced me to read the judge's mind because she asked me a question simply about the creation of the account. I answered the question. I answered it honestly and candidly. She didn't ask me anything further. I moved on. It was a legitimate question. You filed something in response to the motion for summary judgment that said, here are all these badges of fraud. Exactly. Exactly. Including the one that in her oral ruling, she said that we waived. It was in the papers. I would say, Your Honor, in the pecking order of things, what's in your papers prevails over what one might say at oral argument unless it's a very clear waiver. Off the record hearing. Yes. Now, one other point I'd like to make, and this is on the joint and several liability question, in the reply papers below in the record, and this can be located in document 22-5 at page 4, in response, apparently the plaintiffs did not clearly read our papers when we talked about the joint and several liability clause. They say verbatim, one would think UBS would have been familiar with the phrase jointly and severally, and that comes in the context of, in effect, saying that if there were a joint and several liability clause in the agreement, we would have been okay. I think we understand that argument, counsel, and you're over your time. I'm sorry, Your Honor. We need to move on to our next case. Thank you for your indulgence. Thank you. Thank you, Your Honor.